IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| THERESA PURCELL, | ) | CV 15-00211 LEK-RLP |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| AMERICAN AIRLINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT AS TO COUNTS II AND VII**

Before the Court are: Defendant American Airlines,

Inc.'s ("Defendant" or "AA") Motion for Summary Judgment

("Defendant's Motion"); and Plaintiff Theresa Purcell's

("Plaintiff") Motion for Partial Summary Judgment as to Counts II

and VII ("Plaintiff's Motion"), both filed on April 27, 2016.[1]

[Dkt. nos. 45, 47.]  Defendant filed its memorandum in opposition

to Plaintiff's Motion ("Defendant's Opposition") on May 26, 2016,

and Plaintiff filed her memorandum in opposition to Defendant's

Motion ("Plaintiff's Opposition") on June 5, 2016.  [Dkt. nos.

50, 54.]  Plaintiff filed her reply ("Plaintiff's Reply") on

June 6, 2016, and Defendant filed its reply ("Defendant's Reply")

on June 13, 2016.  [Dkt. nos. 60, 65.]   These matters came on

for hearing on July 5, 2016.

---

[1] On June 7, 2016, Plaintiff filed an errata to Plaintiff's
Motion ("Plaintiff's Motion Errata").  [Dkt. no. 63.]

Also on July 5, 2016, this Court issued an entering order granting Defendant's Motion and denying Plaintiff's Motion ("7/5/16 EO Ruling"). [Dkt. no. 76.] The instant Order supersedes the 7/5/16 EO Ruling. After careful consideration of the motions, supporting and opposing memoranda, the arguments of counsel, and the relevant legal authority, Defendant's Motion is HEREBY GRANTED and Plaintiff's Motion is HEREBY DENIED, for the reasons set forth below.

## BACKGROUND

Plaintiff filed her Complaint for Damages ("Complaint") on June 5, 2015. According to the Complaint, Plaintiff is "a disabled American who suffers from Charcot Marie Tooth's Disease."[2] [Complaint at ¶ 2.] Plaintiff's claims arise from an incident on June 13, 2013, in which Defendant allegedly required her to board her flight by "crawl[ing] across the asphalt of an airport tarmac, up the metal stairs of an airplane, and into her seat on Defendant's airplane while passengers behind her watched." [Id.]

The Complaint alleges the following claims: negligence per se, based on violations of the Air Carrier Access Act ("ACAA"), 49 U.S.C. § 41705, et seq. ("Count I"); negligence

---

[2] Plaintiff describes Charcot Marie Tooth's disease as a "debilitating muscular disease that leaves her wheelchair bound" and "weakens the body's muscles and nervous systems." [Pltf.'s Motion Errata, Decl. of Theresa Purcell ("Pltf.'s Decl.") at ¶ 2.]

("Count II"); negligent infliction of emotional distress ("NIED" or "Count III"); intentional infliction of emotional distress ("IIED" or "Count IV"); violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* ("Count V"); discriminatory practices, in violation of Haw. Rev. Stat. Chapter 489 ("Count VI"); negligent training and supervision ("Count VII"); and a claim for punitive damages ("Count VIII"). Plaintiff prays for the following relief: a declaratory judgment that Defendant violated her civil rights under the ADA, the ACAA, and other federal and state laws; special damages; general damages in excess of $75,000, excluding interest and costs; punitive and treble damages; reasonable attorneys' fees and costs; and any other appropriate relief.

On September 24, 2015, this Court issued an entering order granting Defendant's July 16, 2015 motion to dismiss Counts I, V, and VI, and dismissed those claims with prejudice. [Dkt. nos. 8, 21.]

## I.   The Evidence

Much of the evidence relevant to the instant motions is undisputed.  Plaintiff made her reservation for the flight in question on June 12, 2013, through a third-party website that eventually directed her to Defendant's website. [Def.'s Separate and Concise Statement of Material Facts in Supp. of Motion for Summary Judgment ("Def.'s CSOF"), filed 4/27/16 (dkt. no. 46), at

3

¶ 2; Pltf.'s Response to Def.'s Statement of Facts ("Pltf.'s Responsive CSOF"), filed 6/5/15 (dkt. no. 56), at ¶ 2.]  She booked flight number 2612 from San Diego International Airport ("SAN") to Los Angeles International Airport ("LAX") on June 12, 2013, and another flight from LAX to Honolulu International Airport ("HNL").  [Def.'s CSOF, Decl. of Lyle S. Hosoda ("Hosoda Decl."), Exh. B (Pltf.'s OneTravel.com booking receipt).]

        Defendant submitted a declaration stating that a passenger who requires special assistance during boarding must inform AA by completing the "Special Services Request" form during the on-line reservation process.  [Def.'s CSOF, Decl. of Sheryl Tuaileva ("Tuaileva Decl.") at ¶ 5.[3]]  This allows Defendant to ensure that AA has all of the equipment and personnel necessary to accommodate the passenger's special needs. If necessary, AA will contact the passenger ahead of time to discuss her needs.  When a passenger checks the Special Services Request box during the on-line reservation process, additional boxes become available for the passenger to specify the type of services that may be necessary.  [Id.]  AA's Special Services Request form includes a Limited Mobility section, which states:

---

[3] Sheryl Tuaileva is Defendant's "General Manager for Envoy Air at" SAN.  [Tuaileva Decl. at ¶ 1.]  She is "responsible for overseeing the ground operations for the American/American Eagle flights in and out of SAN airport."  [Id. at ¶ 3.]

4

Airport wheelchair service is available for transport to the departure gate and during the connection, if applicable.  Select one option.

- Customer can walk yet requires wheelchair assistance for distance to/from gate. Customer can board the airplane without assistance.

- Customer can walk.  If there are stairs, customer will need assistance boarding the aircraft from the gate.

- Customer cannot walk and will need assistance to the aircraft seat.

[Hosoda Decl., Exh. C (screenshots of Defendant's online reservation process) at 1.]

At her deposition, Plaintiff testified that, when she made her reservation, she did not check the box for a Special Services Request.  She did not do so because she believed it was a waste of time.  She had checked similar boxes for previous flights on other airlines, but, according to Plaintiff, doing so had no effect.  When she did fill out such forms, she would still have to repeat her request at the airport because the staff did not know she needed assistance.  [Hosoda Decl., Exh. A (excerpts of Pltf.'s 2/18/16 depo.) ("Def.'s Excerpts of Pltf. Depo.") at 100-03.]  The flight in question was Plaintiff's first flight on AA.  If Plaintiff had filled out AA's Special Services Request form, she would have chosen the third option.  [Def.'s CSOF at ¶¶ 4-5; Pltf.'s Responsive CSOF, at ¶¶ 4-5.]

On June 12, 2013, Flight 2612 was scheduled to depart
SAN at 12:25 p.m.[4]  Plaintiff and her sister, Merle Percell,
arrived at the airport around 8:00 a.m.  When they checked in,
neither Plaintiff nor her sister informed the ticket agent that
Plaintiff needing assistance during boarding.  When they arrived
at the gate, there was a lot of time left before the departure.
[Def.'s CSOF at ¶¶ 6-8; Pltf.'s Responsive CSOF at ¶¶ 6-8.]
Plaintiff testified at her deposition that, when she and Merle
went to the gate, she told Merle to inform the gate agent that
Plaintiff would need a ramp to board.  Plaintiff testified that
Merle went to counter, but there was a long line or crowd waiting
to see the agents behind the counter because many of the
passengers had questions about the flight delay.  Merle intended
to request a ramp for boarding, but one of the agents yelled at
another passenger.  According to Plaintiff, the agent then told
everyone to hold their questions, so Merle decided to wait to ask
about the ramp.  [Def.'s Excerpts of Pltf. Depo. at 135-37, 141-
42.]  Approximately twenty minutes later, Merle wheeled Plaintiff
to see the agent about the boarding ramp, but the agent said it
was too late.  [Id. at 141-43.]  Plaintiff points out that, in
addition to being in a wheelchair, she "had an ankle boot on from

---

[4] SAN to LAX flights depart from "a remote commuter terminal
at SAN" that "consists of American Eagle, United Express and
Delta operated flights."  [Tuaileva Decl. at ¶ 6, Exhs. F & G
(photos of terminal).]

another injury which made it even more apparent that she was unable to walk." [Pltf.'s Decl. at ¶ 11.]

Plaintiff told the agent that she could not walk up into the plane, and the agent said, "well, you're going to have to figure it out." [Def.'s Excerpts of Pltf. Depo. at 144.] By this time, the boarding process had already started. During usual boarding procedures, those needing special assistance are among the first to board. Although Plaintiff does not remember being offered the opportunity to board first, she stated that she boarded ahead of others. A porter came to help Merle get Plaintiff to the plane. Plaintiff asked the porter if they were going to bring a ramp so that she could board because she could not walk up to the plane. The porter told her it was going to take too long. Plaintiff saw a ramp on the other side of the plane, and she asked if they could just push it over. The porter told her no and repeated that it would take too long. [Id. at 144-46.] When the porter wheeled her outside of the gate doors, there were other passengers outside of the terminal on the tarmac. They were waiting on the side, and Plaintiff and her sister passed them. Plaintiff asked again about the ramp, and the porter repeated that it would take too long. [Id. at 148.]

Defendant submitted a picture of the ramp that it generally uses for boarding and deplaning. [Tuaileva Decl. at ¶¶ 7-8, Exh. H.] Defendant also submitted a picture of the

stairs that would have been used when Plaintiff boarded the plane
on the date in question.  [Tuaileva Decl. at ¶ 10.]  AA generally
uses one ramp at the remote SAN terminal where Plaintiff's flight
departed.  It is located on the American Eagle side of the
terminal.  AA also has access to another ramp on the United
Express side of the terminal.  [Id. at ¶ 16.]  When necessary, AA
can borrow a third ramp from Delta Air Lines ("Delta"), if
Delta's ramp is available and if "providing such an accommodation
does not cause extreme delay."  [Id. at ¶¶ 8, 16.]

     On the date in question, the ramp on the American Eagle
side had been out of service since May 6, 2013 due to a "broken
passenger boarding ramp bumper."  [Id. at ¶ 18.]  It was returned
to service on June 19, 2013.  [Id. & Exh. K (work order for
repair work on the ramp).]  The ramp on the United Express side
was out of service from June 12, 2013 to July 18, 2013.  [Id. at
¶ 19, Exh. L (repair work order).]  According to Defendant,
because of the timing of Plaintiff's request to use the ramp to
board, there was insufficient time to make arrangements to obtain
a ramp from another part of the airport.  [Id. at ¶¶ 20-21.]
Under such circumstances, it is Defendant's "policy and practice
to offer to pay for a ticket for the passenger on the next
available flight on AA or any other airlines to get to their
destination with the least amount of delay."  [Id. at ¶ 21.]  "In
this case, there were at least 2 flights on AA from SAN to LAX

that would have gotten to LAX in time for Plaintiff to make her flight to Honolulu." [Id., Exh. M (list of available flights).] Plaintiff states that she was not offered an alternate flight to LAX, and she would have taken an alternate flight, if one had been offered to her. [Errata to Pltf.'s Separate & Concise Statement of Facts in Opp. to Def.'s Motion, filed 6/8/16 (dkt. no. 64), Decl. of Theresa Purcell ("Pltf.'s Responsive Decl.") at ¶¶ 14-15.]

The porter wheeled Plaintiff to the stairs in front of the plane. Plaintiff got off of her wheelchair, got down on the ground, and crawled on her knees to the stairs. She had to go onto the ground first instead of just going straight to the stairs because she could not fit. The stairs were smaller and more steep than the stairs that typically exist in a home setting. When Plaintiff turned to tell her sister to stand behind her as she went up the stairs, she saw the other passengers behind them. The passengers looked angry because they had to wait, and Plaintiff felt like she had to hurry because everyone was waiting. [Def.'s Excerpts of Pltf. Depo. at 151, 153.] Plaintiff could not go backwards up the stairs – using her buttocks and hands – because the stairs were too narrow. She also had to hurry because she did not want everyone to watch her crawl up the stairs. Plaintiff testified that the time it took her to get from her wheelchair to her seat on the plane "felt

9

like forever." [Id. at 154.] Plaintiff's hands were weak, and
her knees hurt because the stairs were "like sandpaper." [Id. at
154-55.] Plaintiff almost fell backward because the stairs were
so steep. To stop herself from falling, she grabbled the rail
handle, but her hand got caught in a plastic rope on the rail,
causing her arm to hurt. [Id. at 155.] She later developed a
big bruise on her left arm because her "arm got clipped" on the
rail. [Id. at 163.] Plaintiff took pictures of her bruise, but
by the time of her deposition, she had lost the pictures. [Id.]
At her deposition, she testified that she did not seek medical
attention for anything that arose from the incident. The bruise
healed in approximately a week, and the only medication she took
for the pain was Tylenol. [Id. at 177-78.] Now – in response to
Defendant's Motion – Plaintiff states that, about a month after
the incident, she had to stay at Queen's Hospital "for two weeks
for a bad infection on [her] left knee which required surgery and
then [she] was transferred to the Ann Pearl care home for where
[sic] [she] recovered for two months." [Pltf.'s Responsive Decl.
at ¶ 19.] Plaintiff did not submit evidence regarding the cause
of the infection.

Plaintiff states that she "was utterly humiliated and
felt like she was treated like an animal for having to crawl up
the filthy stairway and into her seat on the airplane, not to
mention the rude treatment she and others received from the gate

agent." [Pltf.'s Decl. at ¶ 22.]  At her deposition, Plaintiff
testified that the incident stopped her from performing because
it was too embarrassing to have people ask her about the incident
instead of about her music.[5] [Def.'s Excerpts of Pltf. Depo. at
38-39.]  However, she also testified that, in 2013, after the
incident, she did not cancel any performances, and she was the
opening act at a concert in San Jose.  [Id. at 48-49.]  The
period of time when Plaintiff did not perform for three months
was apparently in 2015, after the news coverage about the
incident.  [Id. at 41, 50.]  After the filing of this lawsuit,
someone affiliated with Plaintiff or her attorney informed the
media about the story.  Plaintiff was asked to do interviews with
the media, and she did one television interview.  [Id. at 69.]
When asked at her deposition when she began feeling humiliation
and embarrassment, Plaintiff responded "[e]specially when the
story broke."  [Id. at 67.]  People made cruel comments after the
news coverage, including making comments about her disability,
calling her "the B word, ugly, fat," and saying "[t]hat's what
she get," "why she suing now," and "[i]t was her fault."  [Id. at
51-53.]

        Plaintiff did not make an administrative complaint
about the incident until she submitted a complaint form on

---

[5] Plaintiff is in the entertainment industry.  She is a
performer, song writer, and producer.  [Def.'s Excerpts of Pltf.
Depo. at 38-39.]

March 27, 2015 through ADA.gov.  [Id. at 173-75; Hosoda Decl. at

¶ 6, Exh. D.]  Plaintiff received an email letter dated April 30,

2015 addressed to her counsel from Christy Garden, Department of

Transportation ("DOT") Liaison, Customer Relations, American

Airlines/US Airways Corporate Office" ("4/30/15 Letter").

[Pltf.'s Motion, Decl. of Counsel; Pltf.'s Motion Errata,

Exh. 1.]  The 4/30/15 Letter states that DOT forwarded

Plaintiff's "correspondence" about the incident, and the letter

states: "On behalf of US Airways and American Airlines, please

accept our apologies for the difficulties Ms. Purcell experienced

with her request for level entry boarding.  It is imperative to

provide essential care and to have a sensitive approach when

assisting our passengers who have special needs." [Pltf.'s

Motion Errata, Exh. 1.]

 The 4/30/15 Letter summarizes an air carrier's duties

under 14 C.F.R. Part 382, and then states:

> We regret that a ramp was not requested so
> Ms. Purcell would be able to board the aircraft
> without going up stairs, assistance
> should have been provided shortly thereafter.
> Based on what you've shared, it appears our
> employees didn't provide the attentive, courteous
> and professional service we expect as a company.
> I understand how the way you are treated can
> affect your impression of our airline and
> sympathize with your displeasure.  After review of
> the facts, **American Airlines admits they were in
> violation of CFR 14 Part 382 for not having
> provided level entry boarding as requested.**
>
> Your frustration and disappointment with the
> situation your parents encountered in Philadelphia

is certainly understandable.  Please rest assured
your concerns have been documented and forwarded
to our Station Manager in San Diego.  The intent
is to use your feedback to help us to improve and
make proactive changes with the goal of improving
our service and providing more efficient
assistance to our passengers with special needs.

[Id. (emphasis added).]

## II.  The Motions

Defendant's Motion seeks summary judgment on all of
Plaintiff's remaining claims.  As to Count II, Defendant argues
that it did not breach the standard of care because Plaintiff did
not make a timely request for boarding assistance.  Defendant
contends that it is entitled to summary judgment on Count III
because Plaintiff has failed to present any evidence that she
suffered a physical injury, which is necessary to support her
NIED claim.  As to Count IV, Defendant argues that the conduct in
question did not rise to the level of outrageous conduct
necessary to support an IIED claim.  Finally, Defendant asserts
that Count VII fails as a matter of law because there is no
evidence that: 1) Defendant's employees were acting outside of
the scope of their employment; and 2) that Defendant knew or
should have known that it had to exercise greater control over
its employees.

Plaintiff's Motion seeks summary judgment on the issue
of liability for Counts II and VII, [Pltf.'s Motion at 1-2,] with
the issue of damages remaining for trial.  [Mem. in Supp. of

13

Pltf.'s Motion at 5.]  Plaintiff argues that the 4/30/15 Letter was an admission that Defendant had a duty to her as a passenger with special needs and that its employees' conduct in this matter breached that duty.  She also argues that her testimony in her deposition and her declaration establishes causation, and therefore she is entitled to summary judgment on liability for Count II.

Further, Plaintiff contends that the admissions in the 4/30/15 Letter prove that Defendant failed to properly train and supervise its employees.  She acknowledges that a negligent training and supervision claim usually requires proof that the employer had notice that it had to exercise greater control or supervision over the employee.  However, Plaintiff argues that proof of notice is not required in this case because of outrageousness of the actions of Defendant's employees.  Further, to the extent that notice was required, her need for assistance was apparent from the fact that she was in a wheelchair and she was wearing an ankle boot.  Plaintiff therefore contends that she is entitled to summary judgment as to the issue of liability for Count VII.

**DISCUSSION**

I.   **Procedural Issues**

A.   **The 4/30/15 Letter**

Defendant first argues that this Court cannot consider the 4/30/15 Letter in ruling on Plaintiff's Motion because it: was not properly authenticated and was not attached to Plaintiff's CSOF, as required by Local Rule 56.1(c) and (h); is irrelevant because Plaintiff's ACAA claim in Count I was dismissed; is inadmissible hearsay under Fed. R. Evid. 802; and does not meet the requirements for the Fed. R. Evid. 801(d)(2) exception for statements by an opposing party. See Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment." (some citations omitted) (citing Fed. R. Civ. P. 56(e))).

The 4/30/15 Letter is described in the Declaration of Counsel attached to Plaintiff's Motion, although Plaintiff did not file the 4/30/15 Letter until she filed Plaintiff's Motion Errata, more than a month later.  Reading Plaintiff's Motion together with Plaintiff's Motion Errata, the 4/30/15 Letter is authenticated as required by Local Rule 56.1(h).  This Court emphasizes that it does not condone Plaintiff's failure to timely file the 4/30/15 Letter with Plaintiff's Motion.  However, insofar as the 4/30/15 Letter was created and transmitted by

15

someone within the AA corporate office, Defendant should have been aware of the letter and was not prejudiced by Plaintiff's late submission.

The 4/30/15 Letter meets the criteria for hearsay set forth in Fed. R. Evid. 801(c).  However, Rule 801(d) states, in pertinent part:

> A statement that meets the following conditions is not hearsay:
>
> . . . .
>
> (2)  An Opposing Party's Statement.  The statement is offered against an opposing party and:
>
> > (A)  was made by the party in an individual or representative capacity;
> >
> > (B)  is one the party manifested that it adopted or believed to be true;
> >
> > (C)  was made by a person whom the party authorized to make a statement on the subject;
> >
> > (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
> >
> > (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

The 4/30/15 Letter was written by Christy Garden, Defendant's "DOT Liaison, Customer Relations" as a response to the complaint that Plaintiff submitted to the DOT.  This Court finds that, based on her position, Ms. Garden: 1) was authorized by Defendant

to respond to DOT complaints; and 2) was Defendant's employee or agent, and responding to Plaintiff's DOT complaint was within the scope of Ms. Gardner's employment relationship with Defendant. This Court therefore CONCLUDES that the 4/30/15 Letter is admissible under an exception to the hearsay rule – either Rule 801(d)(2)(C) or (D).

Finally, this Court rejects Defendant's argument that the 4/30/15 Letter is irrelevant because Count I – Plaintiff's ACAA claim – has already been dismissed.  This Court CONCLUDES that the 4/30/15 Letter is relevant to the standard of care issues for Plaintiff's negligence-based claims.  This Court will therefore consider the 4/30/15 Letter in ruling on the instant Motions.

**B.   Plaintiff's Declaration**

Defendant also argues that this Court should not consider Plaintiff's Declaration because it: is not signed;[6] omits material facts; and contradicts Plaintiff's deposition testimony.  First, this Court does not condone Plaintiff's failure to comply with the Local Rules, which do not allow a party to submit an electronic signature on an affidavit or declaration.  <u>See</u> Local Rule LR100.5.1 ("An electronically filed document requiring the original, wet signature of an individual

---

[6] The version of Plaintiff's Declaration attached to Plaintiff's Motion has an electronic signature.

other than the CM/ECF user, such as an affidavit or declaration, must contain the original or a scanned image of that individual's signature."). Plaintiff, however, submitted another version of her declaration with Plaintiff's Motion Errata. That version is properly signed, and it is substantively identical to the version attached to Plaintiff's Motion. This Court therefore concludes that Defendant was not prejudiced by Plaintiff's failure to sign the version of her declaration attached to Plaintiff's Motion.

Defendant's other arguments do not address the admissibility of Plaintiff's Declaration; they go to the weight that this Court should give to the declaration – *i.e.*, whether Plaintiff's Declaration and the other evidence submitted are sufficient to raise a genuine issue of material fact. This Court therefore rejects Defendant's arguments and will consider Plaintiff's Declaration in ruling on the instant motions. This Court now turns to the merits of the motions.

## II. **Negligence**

Both Plaintiff and Defendant move for summary judgment on Count II - Plaintiff's negligence claim.[7]

> In order to prevail on a negligence claim, a plaintiff is required to prove all four of the necessary elements of negligence:
>
> > (1) A duty, or obligation, recognized by the law, requiring the defendant to conform to a

---

[7] As previously noted, Plaintiff's Motion seeks summary judgment as to liability only.

certain standard of conduct, for the
protection of others against unreasonable
risks;

(2)  A failure on the defendant's part to
conform to the standard required: a breach of
the duty; (3) A reasonably close causal
connection between the conduct and the
resulting injury; and (4) Actual loss or
damage resulting to the interests of another.

Takayama v. Kaiser Found. Hosp., 82 Hawai`i 486,
498–99, 923 P.2d 903, 915–16 (1996) (citation and
brackets omitted).  A prerequisite to any
negligence action is the existence of a duty owed
by the defendant to the plaintiff.  Lee v.
Corregedore, 83 Hawai`i 154, 158, 925 P.2d 324,
328 (1996).  The existence of a duty is entirely a
question of law.  See Hao v. Campbell Estate, 76
Hawai`i 77, 80, 869 P.2d 216, 219 (1994) (citation
omitted). . . .

Molfino v. Yuen, 134 Hawai`i 181, 184, 339 P.3d 679, 682 (2014).

The parties agree that the ACAA and its implementing

regulations – which are codified in 14 C.F.R. Part 382 – set

forth the applicable standard of care for Plaintiff's negligence

claim.  See, e.g., Mem. in Supp. of Def.'s Motion at 9-10;

Pltf.'s Opp. at 3.  Under the ACAA, "an air carrier . . . may not

discriminate against an otherwise qualified individual on the

following grounds: . . . the individual has a physical or mental

impairment that substantially limits one or more major life

activities."  49 U.S.C. § 41705(a)(1).  The Ninth Circuit has

stated:

The ACAA and its implementing regulations
establish the standard of care — or duty — that
[the carrier] owed to [the passenger] regarding
that activity, and so preempt any different or

19

higher standard of care that may exist under
California tort law.

But [the passenger] may still rely on
California tort law to prove the other elements of
her claims — breach, causation, damages, and
remedies.  In other words, if the evidence at
trial shows that [the carrier] provided [the
passenger] with all the assistance required under
the ACAA and its implementing regulations, then
[the carrier] cannot be held liable under state
law for failing to do anything further.  If the
evidence at trial shows that [the carrier] fell
short of compliance with the ACAA and its
implementing regulations, then whether [the
passenger] may recover for any injuries that she
may be able to prove were caused by [the
carrier]'s breach will depend upon the degree to
which California tort law recognizes the ACAA
standard of care as applicable in negligence and
common carrier claims premised on duties to
disabled passengers.

Gilstrap v. United Air Lines, Inc., 709 F.3d 995, 1007 (9th Cir.

2013).

A.   **Plaintiff's Motion**

Plaintiff contends that she is entitled to summary

judgment as to Count II because the 4/30/15 Letter constitutes an

admission that Defendant: "had a duty and obligation to Plaintiff

as a passenger with special needs"; and "breached the standard of

care owed to Plaintiff."  [Mem. in Supp. of Pltf.'s Motion at 7.]

Defendant does not contest that it owed a duty of care to

Plaintiff under the ACAA and the ACAA's implementing regulations.

However, Defendant argues that, under the circumstances of this

case – i.e., because the timing of Plaintiff's request for

20

boarding assistance did not allow for sufficient time to obtain a ramp – it did not breach that duty.

While the 4/30/15 Letter has some probative value, it is not the smoking gun that Plaintiff portrays it as.  The 4/30/15 Letter does admit that Defendant failed to provide the boarding assistance specified in the ACAA regulations.  However, this admission is consistent with Defendant's current position that a ramp was not provided because of the timing of Plaintiff's request.  See Pltf.'s Motion Errata, Exh. 1 ("We regret that **a ramp was not requested** so Ms. Purcell would be able to board the aircraft without going up stairs, assistance should have been provided shortly thereafter." (emphasis added)); id. ("American Airlines admits they were in violation of CFR 14 Part 382 for not having provided level entry boarding **as requested.**" (emphasis added)).  Plaintiff also asserts that the 4/30/15 Letter is proof that "Defendant's employees did not treat Plaintiff according to company standards." [Pltf.'s CSOF at ¶ 12.]  However, even this purported admission is qualified.  See Pltf.'s Motion Errata, Exh. 1 ("**Based on what you've shared, it appears** our employees didn't provide the attentive, courteous and professional service we expect as a company." (emphasis added)).  Further, even if the letter was an admission that Defendant's employees were dismissive, were rude and unprofessional, and did not follow company standards, that does not prove that Defendant breached a

standard "recognized by the law."  <u>See</u> <u>Molfino</u>, 134 Hawai`i at 184, 330 P.3d at 682.

To the extent that Plaintiff seeks summary judgment as to Count II based on the 4/30/15 Letter, this Court must view the letter in the light most favorable to Defendant.  <u>See</u> <u>Crowley v. Bannister</u>, 734 F.3d 967, 976 (9th Cir. 2013) ("We review a grant of summary judgment de novo and must determine, viewing the facts in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." (citations and quotation marks omitted)).  Construing the 4/30/15 Letter in the light most favorable to Defendant, this Court CONCLUDES that Plaintiff has not met her burden of "show[ing] that there is no genuine dispute as to any material fact and [she] is entitled to judgment as a matter of law."  <u>See</u> Fed. R. Civ. P. 56(a).  This Court therefore DENIES Plaintiff's Motion as to Count II.

B.  **<u>Defendant's Motion</u>**

The crux of the defense to Count II is that Defendant did not breach its duty to provide boarding assistance to Plaintiff because: 1) the two ramps that normally would have been available for use on the flight in question were out of service; and 2) Plaintiff did not make her request for assistance in time for Defendant to arrange to use another ramp.  Defendant asserts that the ACAA prohibits air carriers from inquiring about a

22

passenger's disabilities or special requests, and it places the responsibility on the passenger to inform the carrier about her requests and needs.  Defendant, however, does not cite the legal authority for the prohibition of inquiries into a passenger's special needs, [Mem. in Supp. of Def.'s Motion at 3,] and Defendant appears to be mistaken.  14 C.F.R. § 382.95 states:

> (a) As a carrier, you must promptly provide or ensure the provision of assistance requested by or on behalf of passengers with a disability, or **offered by carrier or airport operator personnel and accepted by passengers with a disability, in enplaning and deplaning**.  This assistance must include, as needed, the services of personnel and the use of ground wheelchairs, accessible motorized carts, boarding wheelchairs, and/or on-board wheelchairs where provided in accordance with this part, and ramps or mechanical lifts.
>
> (b) As a carrier, you must, except as otherwise provided in this subpart, provide boarding and deplaning assistance through the use of lifts or ramps at any U.S. commercial service airport with 10,000 or more annual enplanements where boarding and deplaning by level-entry loading bridges or accessible passenger lounges is not available.

(Emphasis added.)[8]  Section 382.95(a) clearly recognizes that a carrier **may offer** boarding assistance to a passenger with a disability, who then has the **choice** to accept or decline the assistance.  See also 14 C.F.R. § 382.11(a)(2) ("You must not require a qualified individual with a disability to accept

---

[8] 14 C.F.R. § 382.97 sets forth exceptions to the § 382.95(b) requirement, but none of those exceptions are at issue in the instant case.

special services (including, but not limited to, preboarding) that the individual does not request.").

However, the fact that a carrier **may** make an unsolicited offer boarding assistance – and has the duty to provide the assistance if the offer is accepted – does not necessarily mean that there is a **duty** to offer assistance to a passenger who does not request it.  Neither § 382.95(a) nor any other provision in the ACAA regulations imposes such a duty.  The ACAA regulations do require carriers to "offer preboarding to passengers with a disability," but only where they "**self-identify at the gate** as needing additional time or assistance to board." 14 C.F.R. § 382.93 (emphasis added).  This Court is not aware of any binding authority interpreting the ACAA regulations as imposing a duty upon carriers to offer assistance to a passenger who has not requested assistance.  This Court therefore CONCLUDES that the ACAA and its implementing regulations do not impose an affirmative duty on carriers to offer assistance to passengers who have disabilities but who have not requested assistance.

As stated *supra*, Plaintiff was not required to give Defendant advance notice of her special needs.  However, pursuant to § 382.95(a), Defendant's duty to "promptly provide or ensure the provision of" boarding assistance to Plaintiff was not triggered until Plaintiff, or someone on her behalf, requested assistance.  It is undisputed that Plaintiff did not request

24

boarding assistance when she made her reservation or when she checked in for her flight.  It is also undisputed that, when Plaintiff and Merle arrived at the gate, there was a significant amount of time remaining before the scheduled departure.  At some point, Merle approached the AA gate agent to request a ramp for Plaintiff, but ultimately did not make the request.  Twenty minutes later, when Merle brought Plaintiff to the gate agent to request a ramp, the agent said it was too late.  [Def.'s CSOF at ¶¶ 8-10; Pltf.'s Responsive CSOF at ¶¶ 8-10.]  Plaintiff testified that, when she and Merle spoke to the gate agent to request a ramp, the boarding process had already started. Although Plaintiff did not remember being offered preboarding, she did board the plane ahead of others.  [Def.'s Excerpts of Pltf. Depo. at 144-45.]  As Plaintiff and Merle were heading to the door, a porter came to assist them.  Plaintiff asked the porter about a ramp, and the porter responded that it would take too long.  Plaintiff saw a ramp on the side of the plane and asked whether that ramp could be brought over, but the porter repeated that it would take too long.  [Id. at 145-46.]

     Defendant has submitted uncontroverted evidence that, on the day of Plaintiff's flight, both ramps that Defendant normally has access to were out of service.  The American Eagle ramp had been out of service since May 6, 2013, but the United Express ramp only went out of service on June 12, 2013 - the day

before Plaintiff's flight.   The only option would have been for
Defendant to arrange to borrow Delta's ramp, but the timing of
Plaintiff's request did not permit Defendant to do so.   [Tuaileva
Decl. at ¶¶ 18-20.]   Thus, the question is whether Defendant
breached its duty by either: 1) allowing both of its readily
available ramps to be out of service on the same day; or
2) failing to arrange to use another operational ramp after
Plaintiff requested boarding assistance.

As to the first theory of breach, 14 C.F.R. § 382.99
states, in pertinent part:

> (a)  As a carrier, you must negotiate in good
> faith with the airport operator of each U.S.
> airport described in § 382.95(b) to ensure the
> provision of lifts for boarding and deplaning
> where level-entry loading bridges are not
> available.
>
> (b)  You must have a written, signed agreement
> with the airport operator allocating
> responsibility for meeting the boarding and
> deplaning assistance requirements of this subpart
> between or among the parties. . . .
>
> . . . .
>
> (e)  The agreement must **ensure that all lifts and
> other accessibility equipment are maintained in
> proper working condition.**
>
> (f)  All carriers and airport operators involved
> are jointly and severally responsible for the
> timely and complete implementation of the
> agreement.
>
> . . . .

(Emphasis added.)  However, the ACAA regulations also recognize

26

that unforeseen mechanical problems may arise with such

equipment.  14 C.F.R. § 382.101 states, in pertinent part:

> When level-entry boarding and deplaning assistance
> is not required to be provided under this subpart,
> you must, as a carrier, provide or ensure the
> provision of boarding and deplaning assistance by
> any available means to which the passenger
> consents.  However, you must never use
> hand-carrying (i.e., directly picking up the
> passenger's body in the arms of one or more
> carrier personnel to effect a level change the
> passenger needs to enter or leave the aircraft),
> even if the passenger consents, unless this is the
> only way of evacuating the individual in the event
> of an emergency.  The situations in which
> level-entry boarding is not required but in which
> you must provide this boarding and deplaning
> assistance include, but are not limited to, the
> following:
>
> > . . . .
>
> > (e)  Circumstances beyond your control (e.g.,
> > unusually severe weather; **unexpected
> > mechanical problems**) prevent the use of a
> > lift.

(Emphasis added.)  Thus, when "unexpected mechanical problems"

arise, a carrier must provide any **available** boarding assistance

that the passenger consents to, except that it cannot use hand-

carrying.  There is no evidence in the record which suggests that

the unavailability of both of Defendant's readily available ramps

was due to anything more than an unexpected mechanical problem.

It is possible for a ramp or lift to be out service for a reason

that could constitute a breach of the duty established in

§ 382.99(e) – for example, a malfunction caused by the failure to

perform routine maintenance – but that is not the case here.

27

Even viewing the evidence in the light most favorable to Plaintiff, she has not presented any evidence that would raise a genuine issue of fact as to whether Defendant breached its duty by failing to ensure that at least one of its readily available ramps was operational on the day of her flight.

The question that remains is whether, in light of the fact that the two readily accessible ramps were out of service at that time, Defendant breached its duty by failing to arrange for the use of another ramp once Plaintiff requested one.  The ACAA regulations do not expressly address this scenario, and this Court is not aware of any binding case law on the issue.  The most closely analogous provision is § 382.99(d), which states that, under the carrier-airport operator agreement, the carrier may

> require that passengers wishing to receive boarding and deplaning assistance requiring the use of a lift for a flight check in for the flight one hour before the standard check-in time for the flight.  If the passenger checks in after this time, you must nonetheless provide the boarding and deplaning assistance by lift if you can do so by making a reasonable effort, without delaying the flight.

Section 382.99(d) does not directly apply because there is no indication in the record addressing whether Defendant has a policy requiring that passengers who wish to use a ramp/lift for boarding check in before the standard check-in time, let alone whether Plaintiff had notice of such a policy.

28

Reading § 382.95(a) together with § 382.99(d), this Court concludes that, regardless of when Plaintiff made her request to use a ramp for boarding assistance, Defendant had a duty to "promptly provide or ensure the provision of" a ramp or lift, if Defendant could "do so by making a reasonable effort, without delaying the flight." The Tuaileva Declaration states that, because of the timing of Plaintiff's request, there was not enough time for Defendant to arrange to use Delta's ramp. [Tuaileva Decl. at ¶ 20.] Contrary to Plaintiff's deposition testimony, her flight departed SAN at its scheduled departure time, 12:25 p.m. [Id. at ¶ 13, Exh. J (Flight History for Flight 2612).] Defendant's expert opines that "[i]dentifying and making arrangements for a ramp to be borrowed from another carrier would have unreasonably delayed the flight for all of the other passengers." [Def.'s CSOF, Decl. of Kristi Avalos ("Avalos Decl.") at ¶ 18.[9]]

Plaintiff has not presented any expert witness to contradict Ms. Avalos's testimony, nor has Plaintiff presented any witness to address the issue of whether another operational ramp was available and could have been obtained through reasonable effort without delaying the flight. Plaintiff has

---

[9] Kristi Avalos is the President and CEO of Accessology Too, LLC, which "provides ADA assessment and evaluation on national disability and accessibility compliance issues." [Avalos Decl. at ¶ 1.]

only submitted her own testimony that, as she was being wheeled on the tarmac to the plane, she "saw a lift that was available next to the plane she was about to board." [Pltf.'s Decl. at ¶ 12.] She has not presented any evidence to raise a genuine issue of fact as to whether the ramp/lift that she saw was operational. The undisputed evidence is that the two ramps that would have otherwise been available for her flight were out of service.

This Court FINDS that, even viewing the record in the light most favorable to Plaintiff, there are no genuine issues of fact as to whether Defendant could have accommodated her request for a ramp/lift through reasonable efforts, without delaying the flight. This Court CONCLUDES that, as the party seeking summary judgment, Defendant has carried its burden of production, and Plaintiff has failed to respond by "'set[ting] forth specific facts showing that there is a genuine issue for trial.'" See Porter v. Cal. Dep't of Corr., 419 F.3d 885, 891 (9th Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Thus, this Count FINDS that there are no issues of material fact for trial as to Count II and CONCLUDES that Defendant is entitled to judgment as a matter of law on that claim. Defendant's Motion is GRANTED as to Count II.

III. **Negligent Training and Supervision**

Both Plaintiff and Defendant move for summary judgment on Count VII - Plaintiff's claim alleging negligent training and supervision.[10]

> For claims of negligent supervision and negligent retention, the relevant inquiry is whether the employer knew or should have known of the danger posed by the particular employee who caused the injury. See, e.g., Henderson v. Prof'l Coatings Corp., 72 Haw. 387, 397, 819 P.2d 84, 91 (1991); Abraham v. S.E. Onorato Garages, 50 Haw. 628, 632, 446 P.2d 821, 825 (1968) ("In order to recover on the theory of negligent promotion there must be a showing that the employer knew or should have known that the employee was incompetent or unfit to perform the job to which he was promoted."). Hawaii's courts have attempted to ensure a "reasonable and proper limitation of the scope of duty of care, [such that an employer would not] be confronted with an unmanageable, unbearable and totally unpredictable liability." See Janssen [v. Am. Hawai`i Cruises, Inc.], 69 Haw. [31,] 35, 731 P.2d [163,] 166 [(1987)].

Howard v. Hertz Corp., CIVIL NO. 13-00645 SOM/KSC, 2016 WL 316781, at *5 (D. Hawai`i Jan. 25, 2016) (some alterations in Howard). In addition, "[t]he key to any claim for negligent training or supervision is foreseeability. If an employer has not been put on notice of the necessity for exercising a greater degree of control or supervision over a particular employee, the employer cannot be held liable as a matter of law." Otani v. City & Cty. of Hawai`i, 126 F. Supp. 2d 1299, 1308 (D. Hawai`i

_____

[10] As previously noted, Plaintiff's Motion seeks summary judgment as to liability only.

1998).  The Hawai`i Supreme Court has stated that "negligent supervision may only be found where an employee is acting **outside** of the scope of his or her employment."  Pulawa v. GTE Hawaiian Tel, 112 Hawai`i 3, 18, 143 P.3d 1205, 1220 (2006) (emphasis in original) (citation and quotation marks omitted).

A.  **Plaintiff's Motion**

Although acknowledging that notice is generally required to prove a negligent training and supervision claim, Plaintiff argues "any notice requirement to Defendant of its employees [sic] conduct is negated by the outrageous act[s]" that they committed.  [Mem. in Supp. of Pltf.'s Motion at 8.] Plaintiff cites no legal authority for this proposition, and this Court is not aware of any.  This Court rejects Plaintiff's argument as contrary to the case law defining the elements of a negligent training and supervision claim under Hawai`i law.

In the alternative, Plaintiff argues that the foreseeability requirement is satisfied because Defendant was on notice of both her need for boarding assistance and its duties to passengers with disabilities under the ACAA.  [Id. at 9.] Plaintiff's argument is misplaced because the crux of her negligent training and supervision claim is not whether it was foreseeable that she could suffer harm if Defendant did not accommodate her request for a ramp/lift.  The critical issues are: 1) whether Defendant's employees who allegedly failed to

32

provide Plaintiff with access to the requested ramp/lift were acting outside of the scope of their employment; and 2) whether Defendant was on notice that it should have exercised a greater degree of control or supervision over those employees.  Plaintiff has not carried her burden of production as to these elements of her claim.

Plaintiff also argues that Defendant admitted in the 4/30/15 Letter that "its employees failed to act in a manner that was in line with company policies and procedures."  [Id. at 8.] The 4/30/15 Letter states that, "[b]ased on what [Plaintiff] shared, it appears our employees didn't provide the attentive, courteous and professional service we expect as a company." Clearly, Defendant's employees could have been more attentive, courteous, and professional in responding to Plaintiff's needs, and the 4/30/15 Letter arguably constitutes evidence that their failure to respond in an attentive, courteous, and professional manner violated company policies and procedures.[11]  However, the failure to comply with company policies and procedures alone is not enough to establish either that the employees were acting outside of the scope of their employment or that Defendant was on

---

[11] Similarly, even assuming that Defendant's employees failed to offer Plaintiff an alternate flight when they could not secure a ramp/lift for her scheduled flight, that would merely show that Defendant's employees failed to follow the company policy to offer to put the passenger on another flight that would get her to her destination with the least amount of delay.

notice that more control or supervision of those employees was required. This Court therefore CONCLUDES that Plaintiff has failed to carry her burden of production as to Count VII and DENIES Plaintiff's Motion as to that claim.

**B.   Defendant's Motion**

The Tuaileva Declaration states:

Here in SAN, we only have 8 flights and an average of 15-17 passengers needing special services. The ramp that AA uses for boarding and deplaning assistance is located to the left in Exhibit H.

8.   We have a ramp for boarding and deplaning assistance on the American Eagle side of the terminal and a second ramp on the United Express side of the terminal. AA uses the ramp depicted in Exhibit H on every departure. If for some reason there are multiple aircrafts on the ground and a ramp is needed, AA can make arrangements to borrow to use [sic] the ramp from United Express or the ramp from Delta Air Lines, if we are notified by a passenger in advance, and providing such an accommodation does not cause extreme delay.

[Tuaileva Decl. at ¶¶ 7-8.] The Avalos Declaration also states that "carriers routinely share and borrow [ramps or lifts] from one another all the time." [Avalos Decl. at ¶ 12.] Defendants have carried their burden of production on summary judgment and identified evidence that, when their employees responded to Plaintiff's request for boarding assistance, they were acting within the scope of their employment.

Even viewing the record in the light most favorable to Plaintiff, there is no evidence which raises a triable issue of

fact as to whether Defendant's employees were acting outside the scope of their employment, which is a required element of Plaintiff's negligent training and supervision claim.  Thus, this Count FINDS that there are no issues of material fact for trial as to Count VII and CONCLUDES that Defendant is entitled to judgment as a matter of law on that claim.  Defendant's Motion is GRANTED as to Count VII.

## IV.  **NIED**

Defendant also seeks summary judgment on Count III, Plaintiff's NIED claim.  Under Hawai`i law, "[t]he elements of a NIED claim consist of: (1) negligent conduct by the defendant; (2) plaintiff's suffered serious emotional distress; (3) defendant's negligent conduct was the legal cause of the serious emotional distress; and (4) physical injury to a person, property, or a mental illness."  Morioka v. Lee, No. CAAP-13-0001761, 2014 WL 4251236, at *13 (Haw. Ct. App. Aug. 27, 2014).  Defendant's Motion contends that Defendant is entitled to summary judgment either because there is no evidence that Plaintiff suffered a physical injury or because the evidence contradicts Plaintiff's claim that she suffered serious emotional distress.  This Court need not reach these issues because the allegedly negligent conduct which Plaintiff relies upon to support her NIED claim is the same allegedly negligent conduct that she based her negligence claim and her negligent training

and supervision claim on.  This Court has granted summary judgment in favor of Defendant as to both of those claims. Insofar as Plaintiff has not identified a genuine issue of fact for trial as to any allegedly negligent conduct that would support her negligence claim or her negligent training and supervision claim, this Court also FINDS that Plaintiff has not identified a genuine issue of fact as to any allegedly negligent conduct that would support her NIED claim.  This Court therefore CONCLUDES that Defendant is entitled to judgment as a matter of law on Count III and GRANTS Defendant's Motion as to that claim.

## V.   IIED

Defendant also seeks summary judgment on Count IV, Plaintiff's IIED claim.  Under Hawai`i law, "[t]he elements of an IIED claim are: '1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another.'"  Simmons v. Aqua Hotels & Resorts, Inc., 130 Hawai`i 325, 332, 310 P.3d 1026, 1033 (Ct. App. 2013) (quoting Hac v. Univ. of Hawai`i, 102 Hawai`i 92, 106-07, 73 P.3d 46, 60-61 (2003)).  Defendant argues that it is entitled to summary judgment because the conduct that Plaintiff relies upon does not rise to the level of outrageousness required to support an IIED claim.

Undoubtedly, having to board her flight by crawling up the stairs was an unpleasant, even humiliating, experience for Plaintiff.  Although this Court understands Plaintiff's outrage at the situation, this Court notes that, to support an IIED claim, it is the defendant's actions that must have been outrageous, not the plaintiff's experience.  The Hawai`i Supreme Court has stated:

> "The term 'outrageous' has been construed to mean without just cause or excuse and beyond all bounds of decency."  Enoka v. AIG Hawai`i Ins. Co., Inc., 109 Hawai`i 537, 559 128 P.3d 850, 872 (2006) (citations and some internal quotation marks omitted).  "The question whether the actions of the alleged tortfeasor are unreasonable or outrageous is for the court in the first instance, although where reasonable people may differ on that question it should be left to the jury." Takaki v. Allied Machinery Corp., 87 Hawai`i 57, 68, 951 P.2d 507, 518 (App. 1998) (quotations and quotation marks omitted).

Young v. Allstate Ins. Co., 119 Hawai`i 403, 429, 198 P.3d 666, 692 (2008).  Further, "actors are not liable for 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'"  Id. at 425, 198 P.3d at 688 (quoting Restatement (Second) of Torts § 46, cmt. d) (citing Prosser and Keeton on Torts, § 12, at 59).

In the instant case, Defendant failed to have an operational ramp/lift readily available at the time of Plaintiff's flight.  Thus, when Plaintiff requested assistance shortly before boarding, Defendant was not able to secure a

ramp/lift without delaying the flight.  As previously noted, there is no evidence in the record which indicates that Defendant's failure to have an operational ramp/lift was the result of a breach of a duty under the ACAA.  Thus, based on the timing of Plaintiff's request for assistance and the fact that both of the ramps/lifts that Defendant had ready access to were not in service on the day of Plaintiff's flight, this Court CONCLUDES, as a matter of law, that Defendant's failure to provide Plaintiff with a ramp/lift for boarding under those circumstances did not rise to the level of outrageous conduct that would support an IIED claim.

Plaintiff has also submitted evidence that, in addition to failing to provide her with a ramp/lift for boarding, Defendant failed to follow the company policy to offer her another flight – on AA or a different carrier – for which boarding assistance would be available.  Plaintiff submitted testimony that she was never offered an alternative flight to LAX and that she would have accepted one, if it had been offered to her.  [Pltf.'s Responsive Decl. at ¶¶ 14-15.]  Defendant has not submitted any evidence that it did offer Plaintiff an alternative flight.  Defendant has merely presented testimony that: its policy and practice under such circumstances was to offer to pay for an alternate flight; and there were other flights available that would have allowed Plaintiff to arrive at LAX in time to

38

make her connecting flight to Honolulu.  [Tuaileva Decl. at ¶ 21, Exh. M (list of available flights).]  For purposes of Defendant's Motion, this Court must view the current record in the light most favorable to Plaintiff, and this Court will accept Plaintiff's testimony that Defendant never offered her an alternative flight. There is no evidence which indicates that Defendant's employees intentionally failed to offer Plaintiff an alternate flight, but the failure to do so was arguably reckless.

It is a close question whether, as a matter of law, the failure to offer Plaintiff an alternate flight because a ramp/lift was not available for her scheduled flight was sufficiently outrageous conduct to support an IIED claim.  As noted above, this Court does not doubt that the experience was traumatic for Plaintiff, but this Court must focus upon whether Defendant's conduct was outrageous, not upon Plaintiff's experience.  This district court has stated:

> Courts have found that "sexually harassing behavior, racial slurs, and accusations of criminal conduct could all possibly be considered outrageous conduct," see Nagata [v. Quest Diagnostics Inc.], 303 F. Supp. 2d [1121,] 1128 [(D. Haw. 2010)] (citing Lapinad v. Pacific Oldsmobile-GMC, Inc., 679 F. Supp. 991, 996 (D. Haw. 1988)), and conduct that does not fit into any of these categories may still raise a question of fact.  Cf. id. (determining that defendant's delay in disclosing error in drug test could be considered outrageous).

Kauhako v. State of Hawai`i Bd. of Educ. Dep't of Educ., CIVIL

39

NO. 13-00567 DKW-BMK, 2015 WL 5312359, at *12 (D. Hawai`i Sept. 9, 2015).

This Court has reviewed the types of alleged conduct that has been ruled to be sufficiently outrageous to survive a motion for summary judgment or a motion to dismiss, and Defendant's alleged conduct in this case does not rise to the same level. See, e.g., Ryder v. Booth, Civil No. 16-00065 HG-KSC, 2016 WL 2745809, at *13 (D. Hawai`i May 11, 2016) (ruling that the plaintiffs alleged sufficient facts to state an IIED claim, recognizing that "reckless or intentional disclosure of confidential informants' identities to dangerous and unauthorized individuals may raise to the level of 'outrageousness'"); Smith-Marras v. Gen. Nutrition Corp., CIVIL 15-00188 LEK-KSC, 2015 WL 8492026, at *4 (D. Hawai`i Dec. 10, 2015) (denying motion to dismiss because reasonable minds could differ on the issue of whether the defendants' conduct was outrageous; the defendants allegedly placed a product on the market without sufficient testing even though they were forced to withdraw a prior formulation of the product based on the United States Food and Drug Administration's findings); Dowkin v. City & Cty. of Honolulu, Civil No. 10-00087 LEK-RLP, 2015 WL 4523490, at *3 (D. Hawai`i July 24, 2015) (noting that the Court had previously ruled that, if the plaintiffs could prove that one of the defendants denied them "back-up cover for discriminatory and/or

retaliatory purposes, reasonable people could differ as to the question of whether this constitutes outrageous conduct sufficient to support an IIED claim, and the issue must be determined by the jury").

In this Court's view, Defendant's alleged conduct in this case is comparable to the defendant's actions in Chan v. Wells Fargo Advisors, LLC, 124 F. Supp. 3d 1045 (D. Hawai`i 2015).  The plaintiff, Chan, brought various claims – including an IIED claim – against his former employer, Wells Fargo Advisors, LLC ("Wells Fargo").  Id. at 1047-48.  This district court granted summary judgment to Wells Fargo on the IIED claim because the IIED claim was barred by Haw. Rev. Stat. § 386-5.  However, the district court also stated:

> Even if that were not so, nothing in the record indicates that Wells Fargo's conduct was sufficiently outrageous to justify damages for an independent IIED claim.  At most, as described below, Chan asserts a disability discrimination claim under [Haw. Rev. Stat. §] 378-2(1) based on Wells Fargo's alleged failure to engage in an interactive process that might have led to a reasonable accommodation allowing him to return to work.  This is not conduct that "exceed[s] all bounds usually tolerated by decent society and which is of a nature especially calculated to cause, and does cause, mental distress of a very serious kind."  Hac, 102 Hawai`i at 106, 73 P.3d at 60.

Id. at 1060 (some alterations in Chan).

In the instant case, Defendant's failure to offer Plaintiff an alternate flight is comparable to Wells Fargo's

41

failure to engage in an interactive process to try find accommodations that would have allowed Chan to return to work. This Court therefore CONCLUDES, as a matter of law, that Defendant's failure to offer Plaintiff an alternative flight does not rise to the level of the type of outrageous conduct that is necessary to support an IIED claim. Further, even considering collectively all of Defendant's actions and omissions that Plaintiff has alleged in this case, this Court CONCLUDES, as a matter of law, that Defendant's conduct does not rise to the level of the type of outrageous conduct that is necessary to support an IIED claim. This Court FINDS that there is no triable issue of fact on the outrageousness element of Plaintiff's IIED claim. Because Plaintiff has failed to make a prima facie showing of outrageous conduct, which is necessary to support an IIED claim, this Court CONCLUDES that Defendant is entitled to judgment as a matter of law on Plaintiff's IIED claim. Defendant's Motion is GRANTED insofar as this Court GRANTS summary judgment to Defendant as to Count IV.

## VI.  <u>Punitive Damages</u>

Finally, this Court must address Count VIII of Plaintiff's Complaint, which alleges a claim for punitive damages. This district court has stated: "A claim for punitive damages is not an independent tort, but a remedy that is incidental to another cause of action." <u>Liberty Mut. Ins. Co. v.</u>

Sumo-Nan LLC, Civil No. 14-00520 DKW-KSC, 2015 WL 2449480, at *6
(D. Hawai`i May 20, 2015) (some citations omitted) (citing Ross
v. Stouffer Hotel Co. (Hawai`i) Ltd., 879 P.2d 1037, 1049 (Haw.
1994); United States ex rel. Lockyer v. Haw. Pac. Health, 490 F.
Supp. 2d 1062, 1088-89 (D. Haw. 2007)).  Insofar as Plaintiff
cannot assert an independent claim for punitive damages and this
Court has granted summary judgment in favor of Defendant on all
of Plaintiff's remaining substantive claims, this Court DISMISSES
Count VIII WITH PREJUDICE.

## CONCLUSION

On the basis of the foregoing, Defendant's Motion for
Summary Judgment, filed April 27, 2016, is HEREBY GRANTED, and
Plaintiff's Motion for Partial Summary Judgment as to Counts II
and VII, also filed April 27, 2016, is HEREBY DENIED.  This Court
GRANTS summary judgment in favor of Defendants as to all of
Plaintiff's remaining substantive claims – Counts II, III, IV,
and VII.  This Court also DISMISSES Count VIII WITH PREJUDICE.

There being no remaining claims in this case, this
Court DIRECTS the Clerk's Office to enter judgment and close the
case on **September 21, 2016**, unless Plaintiff files a motion for
reconsideration of this Order by **September 19, 2016**.  The
judgment shall be in favor of Defendant on all counts, pursuant
to this Court's September 24, 2015 Order Granting Defendant's

Motion to Dismiss Re: Counts I, V, and VI of the Complaint Filed June 5, 2015, [dkt. no 21,] and the instant Order.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, August 31, 2016.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

THERESA PURCELL VS. AMERICAN AIRLINES, INC.; CIVIL 15-00211 LEK-RLP; ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNTS II AND VII